**HAYES et al. v. CRUTCHER et al., Board of Park Commissioners of City of Nashville, Tenn.**

**Civ. No. 1344.**

United States District Court
M. D. Tennessee, Nashville Division.

Nov. 21, 1952.

1. See also Commonwealth of Pennsylvania ex rel. Gibbs v. Ashe, D.C.W.D.Pa.1950, 93 F.Supp. 542.

Z. Alexander Looby, Nashville, Tenn., Avon N. Williams, Jr., Knoxville, Tenn., Thurgood Marshall, New York City, for plaintiffs.

Z. T. Osborn, Jr., City Atty., Nashville, Tenn., for defendants.

WILKIN, District Judge.

This case was submitted on the complaint, answer, motion for summary judgment, and briefs.

The complaint alleges that plaintiffs act for themselves and others similarly situated, as a class; that the defendants constitute the Board of Park Commissioners of the City of Nashville; and it asks for a declaratory judgment determining plaintiffs' rights under the Fourteenth Amendment of the Constitution of the United States and an injunction, (prayer numbered 3)

"Restraining the defendants from denying, failing, or refusing to provide to plaintiffs and other negro citizens of the City of Nashville, on account of their race and color, rights and privileges of using the City golf courses equal to those afforded to white persons in the City of Nashville," and (prayer numbered 4)

"Forever restraining the defendants from making any distinction based upon race or color in the opportunities, advantages, and facilities provided by the defendants for the public golf courses in the City of Nashville."

The answer denies that plaintiffs are representatives of the class described, and that there is a genuine or actual controversy. Defendants allege: "That the golf courses named were supported by greens' fees charged players", and as a second defense, allege: "That they are now engaged in the planning of separate and equal golf facilities for the negro citizens of the community, and that such facilities would be constructed within the 'reasonable future'."

There is no denial that the City maintains three golf courses and that it has been the policy and practice to observe the custom of segregation regarding the use of such courses. They have not been used by negroes.

In view of the pleadings and the issues thus raised, the motion will have to be overruled so far as prayer numbered 3 is concerned. That prayer seeks rights and privileges for negroes on City golf courses equal to those provided for white persons— or equal facilities. The law recognizes the justice of such a request, but as to this issue, there is dispute as to material facts, which requires evidence for its determination. Do the plaintiffs represent a class? Is there a real demand by negroes for the use of the golf courses? What is the extent of the interests which the plaintiffs represent? What is the present "planning of separate and equal facilities" which defendants allege they are now engaged in? What time will be required for defendants to furnish plaintiffs equal and separate golf course facilities? What can and ought to be done in the meantime? These are questions which should be answered before this Court can issue an order as prayed for in prayer numbered 3.

The allegations in the answer that there is want of good faith on the part of the plaintiffs and that the golf courses are supported by greens' fees are not sufficient in law to justify the refusal of defendants to afford negroes facilities for golf equal to those furnished other residents of the City. But the decisions relied on by the plaintiffs recognize that, as stated by Chief Judge Hutcheson in the case of Beal v. Holcombe, 5 Cir., 193 F.2d 384, 388: "The decree, however, shall afford defendants a reasonable opportunity to promptly prepare" etc., for compliance with the Court order.

Since there are issues as to material facts so far as prayer numbered 3 is concerned, the motion cannot be sustained.

As to prayer numbered 4, in view of the implied admission of the defendants as to their policy, practice and custom regarding segregation, and their intention to continue it, the motion can and should be sustained if segregation is unconstitutional or unlawful. The plaintiffs frankly admit that the real purpose of the motion for summary judgment is to raise this question. The burden of their brief is an argument that segregation is itself unconstitutional and unlawful.

This Court finds that segregation or no segregation is a fact of social or political life. Federal law does neither command it, nor prohibit it. Segregation exists in some communities and does not exist in others. It varies with the varying conditions of different societies.

An examination of the authorities constrains this Court to hold that the principle announced by the Supreme Court in the case of Plessy v. Ferguson, 163 U.S. 537, 544, 16 S.Ct. 1138, 41 L.Ed. 256, cases there cited and subsequent cases, is still the law of the land. The Court held in that case that the object of the Fourteenth Amendment was to enforce the equality of the two races before the law, and that segregation was lawful provided equal facilities were furnished to both segregated groups in cases where public authority furnished facilities for the use of citizens.

An examination of the cases upon which the plaintiffs place their principal reliance reveals that segregation, so far as the United States Constitution is concerned, is not forbidden if separate, but equal, treatment is accorded to the segregated groups. The principle was clearly recognized in those cases where a similar question was raised as to the right of negroes to use city golf courses. In the case of Beal v. Holcomb, supra, relief was granted because equal opportunity had not been afforded "while preserving segregation". In the case of Law v. Mayor, etc., D.C., 78 F.Supp. 346, 347, Judge Chestnut held that negroes could not be excluded from public golf courses without "substantially equal provision" for their enjoyment. He recognized that the Board in control of golf courses might find a fair solution "in continuing to reserve Carroll Park exclusively for negroe golfers," if it were made substantially equal to other courses. The case of Williams v. Kansas City, D.C., 104 F.Supp. 848, turned mainly on the provision of state law, but the opinion recognized that segregation itself was not inhibited by federal law. (Syllabus 7, Findings 6, Conclusion 20).

It seems that segregation is not only recognized in constitutional law and judicial decision, but that it is also supported by general principles of natural law. As nature has produced different species, so it has produced different races of men. Distinguishing racial features have not been produced by man, or man-made laws. They are the result of processes of evolution and it seems natural and customary for different species and different races to recognize and prefer as intimate associates their own kind. Nature has produced white birds, black birds, blue birds, and red birds, and they do not roost on the same limb or use the same nest. Such recognition and preference for their own kind prevails among other animals. It prevails also among all people, among the yellow, black and red skinned races.

The law recognizes these natural and instinctive principles and practices of life. It does not attempt to inhibit them. It would be futile to attempt to do so. This nation's experience with the Eighteenth Amendment shows that there are forces of nature that cannot be changed by a constitutional amendment or judicial decree. A government like ours does not attempt to make law or enforce law which is contrary to the general will of the community. Our government and its commands and decrees are the expression of the general will. A court of sense and character, or experience, does not command anything to be done which is impossible, because there is no method by which its order can be enforced.

The law does, however, attempt to preserve and protect the basic legal rights of all persons regardless of race or color. The force of the law is set against oppression and exploitation. It is a fundamental principle of Western civilization that man is sacred to man. The degradation of any man by the denial of his inalienable rights is an assault upon humankind. Roman and Anglo-American jurisprudence is replete with fundamental principles which courts of law recognize and enforce in order to preserve the dignity and sanctity of human nature. Our Declaration of Independence and our Constitution recognized these principles and provided that government itself should be subject to them.

But our Government and its law does not intrude into the private and social affairs of life. In their private and social affairs all men are free. There is a realm of life where law is absolute; the law commands what may and what may not be done. There is another realm where freedom is absolute; each individual is at liberty to do as he pleases. Then there is another realm in between where the law does not command but the individual is not entirely free. In this middle realm individual rights and obligations and social rights and obligations are brought into impingement and here conduct is controlled generally by rules and customs of civil decency, social decorum, and polite manners. It has been a sound policy of the liberalism of Western civilization and all republican and democratic governments to keep this middle realm as broad as possible, because the extension of the realm of absolute law tends to totalitarian government, tyranny and absolutism, which thwart human evolution. The maintenance of a broad middle ground depends on the acceptance by the people of its obligations.

Racial differences do not in any way or any degree justify arrogance, pride, intolerance, or abuse. Among all races there are those in great need of deliverance from racial hatred, provincialism and prejudice. But that condition cannot be changed by constitutional provision or judicial decree. Relief from such littleness of mind and blindness of heart requires education, philosophy and religion. All great religious systems inculcate racial tolerance, and the Christian religion, with its Hebraic antecedence, which is the fountain source of Western civilization, is especially qualified by its teaching of humility, compassion, and loving care (*caritas*) to create that inner life of the spirit which can make a limitless community to which all men will feel they belong as partners, mutually responsible for one another under God.

It would be poor policy to attempt to do by judicial decree or any other form of legal compulsion what can be done effec-

tively only by education and religious inspiration. During recent years there has been a tendency prompted by over-zealous champions of democracy to extend democratic processes and legal procedure into fields where they are not qualified to serve. By burdening democratic and legal processes with obligations which they are not able to meet, they bring democracy and law into disrepute and disintegration. This tendency has been incited and increased by open champions and subversive agents of the world revolution which has been advancing under the banner of communism. The open and avowed purpose of such revolutionaries is to eradicate all religion and to destroy our system of law and jurisprudence which has been developed in the Judean-Greek-Roman-Christian tradition. Those who intentionally or unwittingly are overburdening democratic and legal processes and destroying the delicate balance and apportionment of powers upon which our way of life depends, play into the hands of the revolutionaries. While they may think they are championing freedom and liberalism, they are bringing about a totalitarianism which will destroy the very object that they seek to serve.

This Court therefore concludes that segregation itself (where legal rights are unaffected) is not unconstitutional or unlawful; that it is a natural tendency which in the progress of man's political, social and spiritual evolution may change or disappear; but that it would be inexpedient and unwise to attempt to prevent or prohibit it (or enforce unrestricted association) by judicial decree.

The motion for summary judgment will therefore be overruled, and the case will stand for trial on the disputed issues of fact. Upon proof of demand and refusal, and the substance and extent of the demand and the number represented, the relief asked in prayer numbered 3 will be granted and the defendants required, while maintaining segregation, to afford equal facilities, apportioned to the need, to the segregated groups, either part-time use of present facilities or full-time use of separate facilities, or such other arrangement for equal and fair opportunities as conditions may require.