Bjorgen, C.J.
¶41 (dissenting) —
I
¶42
Through tattered clothes great vices do appear; Robes and furred gowns hide all. Plate sin with gold, And the strong lance of justice hurtless breaks; Arm it in rags, a pigmy’s straw does pierce it.
William Shakespeare, King Lear, act 4, sc. 6.
*165 ¶43 Our progress injustice is measured in large part by our progress in putting the lie to Lear’s words. Perhaps the prime current example of that fitful struggle is our evolving view of legal financial obligations (LFOs).
¶44 State v. Blazina, 182 Wn.2d 827, 835-37, 344 P.3d 680 (2015), and the studies it cites recognized that the exaction of LFOs from the indigent and near indigent forges in many cases a lingering debt that impedes rehabilitation and reentry into civil society. In Washington, LFO debt is charged interest at 12 percent per year and may be subject to collection fees when not paid on time. Id. at 836. At this rate, those able to pay only $25 per month, for example, will actually owe more 10 years after conviction than when first assessed. Id. Those with scant means, thus, may face a growing, seemingly intractable debt long after their punishment has been served, both chaining them to the continuing jurisdiction of criminal court and tightening financial straits that may tempt further crime. Those with the means, in contrast, may redeem themselves from debt and jurisdiction almost at will. A starker illustration of Lear’s indictment is hard to find.
¶45 In Washington, though, gold weighs less in the scales after Blazina. In that decision, our Supreme Court held that in implementing the requirements of RCW 10.01-.160(3)[7] for discretionary LFOs,
the court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry. The record must reflect that the trial court made an individualized inquiry into the defendant’s current and future ability to pay. Within this inquiry, the court must also consider important factors . . . , such as incarceration and a defendant’s other debts, including restitution, when determining a defendant’s ability to pay.
Id. at 838.
*166 ¶46 Arthur Dove was assessed a discretionary LFO almost a year before Blazina issued and without the determination of his ability to pay required by that decision. Dove filed this personal restraint petition (PRP) on July 15, 2015, about four months after Blazina, but one year and three months after his sentence became final.
¶47 As the majority points out, Dove’s PRP may be entertained only if it falls within one of the exceptions to the one-year time bar. Among these is the exception of RCW 10.73.100(6), covering situations when there has been a “significant change in the law” that is “material to the . . . sentence” and a court determines that “sufficient reasons exist to require retroactive application” of the changed law. This exception opens the sole passage to a just result when, in justice, a change in the law ought to be applied to those sentenced before the change was effective. As such, this exception ought to be given ample breathing room. For the reasons set out below, I believe Blazina constitutes just such a change in the law, affording Dove dispensation from the time bar. For that reason, I dissent.
II
¶48 In describing the state of the law before Blazina, one must begin with RCW 10.01.160(3), which provided at the time of that decision that
[t]he court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.
Thus, Blazina did not change the law by requiring some determination of ability to pay or by requiring the sentencing court to take financial resources and the burden created into account to some extent. The decision profoundly changed the law, though, in the substance of that determination and the way in which it must be made.
*167 ¶49 Before Blazina, a trial court was “prohibited from imposing legal financial obligations only when it appears from the record that there is no likelihood that the defendant’s indigency will end.” State v. Lundy, 176 Wn. App. 96, 99, 308 P.3d 755 (2013). This standard was consistent with the Supreme Court’s statement in State v. Curry that one of the requirements of a constitutionally permissible costs and fee system is that “‘[a] repayment obligation may not be imposed if it appears there is no likelihood the defendant’s indigency will end.’” 118 Wn.2d 911, 915, 829 P.2d 166 (1992) (quoting State v. Eisenman, 62 Wn. App. 640, 644 n.10, 810 P.2d 55, 817 P.2d 867 (1991)). Lundy described the State’s burden in showing ability to pay discretionary LFOs as “a low one.” Lundy, 176 Wn. App. at 106. To illustrate this burden, Lundy pointed to the decision in State v. Baldwin, 63 Wn. App. 303, 311, 818 P.2d 1116, 837 P.2d 646 (1991), which held that a single sentence in a presentence report, “ ‘Mr. Baldwin describes himself as employable, and should be held accountable for legal financial obligations normally associated with this offense,”’ was sufficient. Lundy, 176 Wn. App. at 106 (internal quotation marks omitted).
¶50 Baldwin, in turn, characterized RCW 10.01.160 as requiring only that the trial court “ ‘take account of’ ” the relevant facts in imposing LFOs. Baldwin, 63 Wn. App. at 310 (quoting RCW 10.01.160(3)). Baldwin found this requirement to be met merely because the court had imposed costs and attorney fees in the sum of $585, but declined to impose the fine of $1,000 for violation of the Uniform Controlled Substances Act, chapter 69.50 RCW. Id. at 311.
¶51 Blazina put an end to this flaccid interpretation of RCW 10.01.160. Now, instead of relieving a defendant from LFOs only if there is no likelihood indigency will ever end, Blazina directs courts to the different ways of establishing indigency in GR 34 and holds that “if someone does meet the GR 34 standard for indigency, courts should seriously question that person’s ability to pay LFOs.” Blazina, 182 *168 Wn.2d at 839. Blazina also ended the sway of the previous “low” burden imposed by RCW 10.01.160 in determining ability to pay. Now, instead of Baldwin’s mirage-like requirement to “take account” of “relevant facts” in the most cursory way, Blazina demands that the record “reflect that the sentencing judge made an individualized inquiry into the defendant’s current and future ability to pay.” Id. In making this inquiry, it is no longer sufficient merely to impose one assessment but not another, as in Baldwin. Rather, in addition to obvious criteria like income and assets, a court must in fact consider matters such as incarceration and a defendant’s other debts, including restitution, when determining ability to pay. Id. Blazina also ended reliance on the common expedient virtually invited by the prior case law, a boilerplate finding that the court engaged in the required inquiry. Id. Now, the record must show that the court actually did so.
¶52 Finally, Blazina modified what would seem to be the voice of the plain language of RCW 10.01.160(3). As noted, that provision stated that “[a] court shall not order a defendant to pay costs unless the defendant is or will be able to pay them.” RCW 10.01.160(3). This is equivalent to stating that a court may order costs if the defendant is currently able to pay or if the defendant will be able to pay in the future. Blazina transformed this from a disjunctive choice to a conjunctive command through its requirement that the record reflect “an individualized inquiry into the defendant’s current and future ability to pay.” Blazina, 182 Wn.2d at 839 (emphasis added). No more may a court fulfill its obligation through one or the other inquiry.
¶53 These changes are significant and material for purposes of the time-bar exception in RCW 10.73.100(6), whether considered on their face or against the standards of State v. Miller, 185 Wn.2d 111, 371 P.3d 528 (2016). Miller specifies that the “significant change in the law” exemption in RCW 10.73.100(6) applies when an intervening appellate decision overturns a prior appellate decision that was *169 determinative of a material issue, but is not met by an intervening appellate decision that settles a point of law without overturning prior precedent or simply applies settled law to new facts. Id. at 114-15. As shown above, Blazina contradicts and thus overturns central aspects of a number of prior decisions, including Lundy, Baldwin, and Curry. Under this basic characterization in Miller, it is a significant change in the law.
¶54 Miller also made clear that to work a significant change in the law, a decision must do more than dispel dicta or alter the ordinary practitioner’s understanding of the law. Id. at 116. The aspects of prior decisions that were quelled by Blazina, discussed above, were not peripheral to those decisions or their holdings. Rather, they went to the heart of the required inquiry of ability to pay, and thus to the heart of the holdings of those decisions. Blazina did not merely dispel dicta.
¶55 On the other hand, Blazina certainly altered the ordinary practitioner’s understanding of the law, but that is the inevitable result of any major change in the law. In fact, the more significant the change, the deeper the effect on practitioners’ understanding. The key, rather, is whether the intervening decision changed prior law. If it did, as here, the effect on practice is beside the point.
¶56 Miller also counsels that one test to determine whether an intervening case represents a significant change in the law is whether the defendant could have argued this issue before publication of the decision. Id. This test cannot be used as a litmus, though, since it is often possible to make nonfrivolous arguments that a decision be overturned. If this test were conclusive, then Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), would not be deemed a significant change in the law, since similar arguments could have been raised before 1954 as Plessy v. Ferguson, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), overruled by Brown, 347 U.S. 483, was eroded.
*170 ¶57 Miller’s basic guidance points in one direction: the changes worked by Blazina did not just disturb prior practice, but significantly changed the law, both substantive and procedural, governing discretionary LFOs. These changes were material because they elevated the showing needed to impose discretionary LFOs. Dove’s discretionary LFO, in fact, would not have passed muster under Blazina because, as the majority points out, the record shows that the sentencing court did not actually assess Dove’s ability to pay.[8]
¶58 Finally, for the exception of RCW 10.73.100(6) to apply, a court must determine that “sufficient reasons exist to require retroactive application” of the changed law. All the potential trapdoors in LFO systems noted above and described more fully in Blazina await those sentenced before Blazina as much as they do those sentenced after. All the inequities in opening these trapdoors for those who cannot easily pay, while those with means escape their dangers, arise with those sentenced before Blazina, as much as with those sentenced after. Admittedly, opening this exception will likely result in a surge of PRPs. Closing the exception, though, will likely consign many sentenced before Blazina to carry a growing debt that they realistically have no ability to pay, keeping them in the criminal justice system and within the gravity of temptations to reoffend that our system is designed to still.
¶59 By opening the door of RCW 10.73.100(6) to Dove and others in his position, we have a clear chance to help turn Lear’s hard truths into antique lies. We should take the current while it serves. For these reasons, I dissent.
Reconsideration granted October 31, 2016 to waive appellate costs.
Review denied at 188 Wn.2d 1008 (2017).

 RCW 10.01.160 was amended in 2015. The amendment does not affect the issues in this case.

 Perhaps the most obvious change made by Blazina was its modification of prior ripeness doctrine by allowing a defendant to challenge ability to pay LFOs before enforcement. As the majority points out, though, Dove’s judgment and sentence stated that LFO payments would commence immediately. For this reason, I agree that the change in the ripeness doctrine is not material to Dove.