### UNITED STATES ex rel. LYNN v. DOWNER.

#### No. 176.

Circuit Court of Appeals, Second Circuit.

Feb. 2, 1944.

398

Conrad J. Lynn, Albert C. Gilbert, and Hays, St. John, Abramson & Schulman, all of New York City (Arthur Garfield Hays, Albert C. Gilbert and Gerald Weatherly, all of New York City, of counsel), for appellant.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith and Frank J. Parker, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for respondent.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

The appellant, a Negro, is a citizen of the United States who was inducted into the Army on December 19, 1942. He waived furlough and was sent immediately to Camp Upton at which the respondent, Col. Downer, is the commanding officer. By petition for a writ of habeas corpus the appellant sought release from the Army on the ground that he was inducted "as a member of a 'Negro quota'"

in violation of the provision of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 304(a), prohibiting "discrimination against any person on account of race or color." The respondent made return to the writ, alleging that the appellant was held as a soldier in the Army, having been lawfully selected for service and duly and regularly inducted. By traverse to the return the appellant reasserted that he was unlawfully selected for induction into the armed forces as a member of a Negro quota. After a hearing the district court quashed the writ and dismissed the petition for failure of proof.

The record discloses the following: The appellant duly registered under the Selective Service Act with Local Board No. 261, Jamaica, Long Island. He received from his local board an order dated September 8, 1942, to report for induction on September 18th. This order was issued pursuant to a requisition by the New York City Director of Selective Service which informed Local Board No. 261 that "Your Quota for this Call is the first 90 White men and the first 50 Negro men who are in Class 1A. * * * Separate Delivery Lists (Form 151) are to be made for the White and Negro registrants delivered." The New York City Director testified: "We receive a requisition from the government for so many white men and so many colored men for induction each month and then we break that list down among the local boards and that is on a proportionary basis and each board will be called upon to produce so many whites and so many Negroes for induction."[1] Desiring to contest the validity of the induction order based on the abovementioned requisition, the appellant failed to report for induction on September 18th. By such failure he became a delinquent. Under section 11 of the Act, 50 U.S.C.A. Appendix, § 311, he was indicted for disobedience of the induction order. Thereafter his lawyers advised him that in order to raise the question of discrimination he must go into the Army, and the local

<hr />

[1] This practice apparently conforms with the Selective Service Regulations, 2d edition, 6 Fed.Reg. 6848; 7 Fed.Reg. 2092, 5343, 6516; Sec. 632.1 Induction Calls by the Director of Selective Service; Sec. 632.2 Induction Calls by the State Director of Selective Service; Sec. 623.3 Selection of Men to Fill Induction Call. "(a) Each local board, when it receives a call, shall select a sufficient number of specified men to fill the call. It shall first select specified men who have volunteered for induction. To fill the balance of the call, it shall select specified men from such group or groups as the Director of Selective Service may designate, provided that within a group selection shall be made in the sequence of order numbers. * * *"

board was informed that he was ready to go. It issued an order dated December 10, 1942, requiring him to report for induction on December 19, 1942. This order he obeyed. He was thereupon inducted and sent to Camp Upton for training. The testimony is to the effect that he was inducted as a delinquent and that a delinquent will be inducted "without any quota call" and without reference to his race or color. 'It further appears that requisitions were made upon Local Board 261 calling for 117 whites and 103 Negroes in October, 134 whites and 100 Negroes in November, and 174 whites and 97 Negroes in December; but that these requisitions related to men other than the appellant. The trial judge ruled that the relator had not proved that "he was inducted under any order which calls for so many whites and so many colored," and therefore had not succeeded in raising the question which the habeas corpus proceeding was intended to present for decision.

■ If the appellant was inducted as a delinquent, he became delinquent by refusal to obey the September induction order which was issued pursuant to the requisition for 90 whites and 50 Negroes for induction in September. Hence the requisition was a direct cause of his induction into the Army and constituted, we believe, sufficient proof of the allegation in his petition that he was inducted as "a member of a Negro quota."

■ The appellee argues that even if this be true, the record is barren of any evidence that the appellant was inducted or directed to report for induction ahead of men whose draft numbers were lower than his own, and therefore there is no proof of discrimination against him "on account of race or color." To this appellant's counsel replies that the existence of separate quotas for whites and Negroes makes it incredible that he was called for induction precisely in his turn under the draft; and that there was discrimination against him if he were called either sooner or later than would have happened in the absence of separate quotas.[2] If the appellant was called for induction later than his turn, his grievance seems to be that the military custody in which he now finds

himself should have begun at an earlier date. But how does the fact that the Army should have had him sooner make unlawful its having him now? Delay in calling him may have resulted in discrimination against others who were called ahead of their turn, but we find it difficult to regard it as a discrimination making illegal the Army's present custody of him. Even if the induction practice had been conducted without separate quotas, as he claims it should have been, he would now be, as he is, in the Army. In failing to prove that the requisition under which he was called for induction resulted in calling him ahead of his turn in the draft, a majority of the court believes that the petition was properly dismissed for failure of proof that he was aggrieved by the discrimination, if any there was.

But the dismissal may also be sustained on broader grounds which we are inclined to discuss, since the parties have thoroughly briefed and argued the question of statutory construction and the question is an important one.

■ In arguing that the practice of calling for specified numbers of whites and Negroes for induction during a given month is contrary to the statute, the appellant relies upon the following language in section 4, 50 U.S.C.A.Appendix, § 304:

"(a) The selection of men for training and service under section 3 [section 303 of this appendix] (other than those who are voluntarily inducted pursuant to this Act) shall be made in an impartial manner, under such rules and regulations as the President may prescribe, from the men who are liable for such training and service and who at the time of selection are registered and classified but not deferred or exempted: Provided, That in the selection and training of men under this Act, and in the interpretation and execution of the provisions of this Act, there shall be no discrimination against any person on account of race or color: * * *."

In interpreting and applying this language the Army's history of separate regiments of whites and Negroes must not be overlooked. Indeed, the appellant does not contend, and could not successfully do so,

---

[2] Counsel cites Selective Service Regulations 2d ed., Sec. 623.1(c) reading as follows: "(c) In classifying a registrant there shall be no discrimination for or against him because of his race, creed, or color, or because of his membership or activity in any labor, political, religious, or other organization. Each registrant shall receive equal and fair justice."

that after selectees are lawfully inducted under the Selective Training and Service Act of 1940 they may not be segregated into white and colored regiments. Since July 28, 1866 federal statutes have made provision for separate Negro regiments. 14 Stat. 332. And the same Congress which enacted the Selective Training and Service Act in September 1940 had passed in July of that year section 2(b) of the National Defense Act, 10 U.S.C.A. §§ 602 note, 621a, which is printed in the margin.[3] Also relevant to interpreting the language under discussion are provisions in section 3(a), 50 U.S.C.A.Appendix, § 303(a), to the effect that the men inducted into the land and naval forces shall be assigned to camps or units of such forces for training and service, and that no men shall be inducted until adequate accommodations for them have been provided.[4] Reading the Act as a whole and in the light of the Army's long established practice of segregating enlisted men into separate white and colored units, we believe that requisitions calling for a specified number of whites and a specified number of Negroes for induction during a given month and based on relative racial proportions of the men registered with a local board and subject to call for induction, is a necessary and permissible administrative procedure, and the regulations which sanction it[5] are not violative of the Act. The induction routine that has been established is calculated to supply men in conformity with the contemplated military organization which permits separate colored regiments. The Army executives are to decide the Army's needs, to provide accommodations and facilities for selectees and to induct them only when camps or units are ready to receive them. To hold that the provision in section 4 forbidding discrimination invalidates such induction routine would frustrate, or at least impede, the development of an effective armed force, the prompt creation of which was the very purpose and object of the Act.

Nothing requiring this result is to be found in the legislative history of the Selective Training and Service Act of 1940. As originally introduced the bill contained no provision forbidding discrimination on account of race or color. On August 23rd Senator Wagner proposed the amendment, which was incorporated into section 3, to the effect that any person regardless of race or color shall be afforded an opportunity to volunteer.[6] In debate he explained that this had nothing to do with segregation into white or colored military units.[7] The provision against discrimination which appears in section 4 was proposed by Congressman Fish on September 6th. His amendment, he stated, was intended to afford to soldiers drafted for induction into the Army the same assurance against discrimination that Senator Wagner's amendment provided for volunteers.[8] During consideration of the Fish amendment Congressman Andrews of the

---

[3] 54 Stat. 713: Sec. 2. "(b) The President may, during the fiscal year 1941, assign officers and enlisted men to the various branches of the Army in such numbers as he considers necessary, irrespective of the limitations on the strength of any particular branch of the Army set forth in the National Defense Act of June 3, 1916, as amended: Provided that no Negro, because of race, shall be excluded from enlistment in the Army for service with colored military units now organized or to be organized for such service."

[4] So far as material, § 303(a) reads as follows: "* * * Provided, That within the limits of the quota determined under section 4(b) (section 304(b) of this appendix) for the subdivision in which he resides, any person, regardless of race or color, between the ages of eighteen and forty-five, shall be afforded an opportunity to volunteer for induction into the land or naval forces of the United States for the training and service prescribed in subsection (b), * * * Pro-

vided further, That no man shall be inducted for training and service under this Act unless and until he is acceptable to the land or naval forces for such training and service and his physical and mental fitness for such training and service has been satisfactorily determined: Provided further, That no men shall be inducted for such training and service until adequate provision shall have been made for such shelter, sanitary facilities, water supplies, heating and lighting arrangements, medical care, and hospital accommodations, for such men, as may be determined by the Secretary of War or the Secretary of the Navy, as the case may be, to be essential to public and personal health: * * * The men inducted into the land or naval forces for training and service under this Act shall be assigned to camps or units of such forces: * * *."

[5] See note 1, supra.

[6] 86 Cong.Rec. p. 10,789.

[7] 86 Cong.Rec. p. 10,890.

[8] 86 Cong.Rec. p. 11,675.

Military Affairs Committee informed the House of Representatives that the amendment seeks to do what the War Department already states it will do under regulations, namely, call Negroes for induction in accordance with the ratio they bear to the population.[9] And Congressman Thomason of Texas included in his remarks during the consideration of the Act a letter from the Joint Army and Navy Selective Service Committee which informed Congress that the selective service program contemplated separate white and Negro quotas and calls.[10]

■■■ If the Congress had intended to prohibit separate white and Negro quotas and calls we believe it would have expressed such intention more definitely than by the general prohibition against discrimination appearing in section 4. Moreover,. it is not without significance, we think, that the induction procedure which has been established has never been altered by congressional action, although the Act has been often amended since its original enactment. In our opinion the statutory provisions which the appellant invokes mean no more than that Negroes must be accorded privileges substantially equal to those afforded whites in the matter of volunteering, induction, training and service under the Act; in other words, separate quotas in the requisitions based on relative racial proportions of the men subject to call do not constitute the prohibited "discrimination". Compare cases dealing with discrimination claimed to be repugnant to the Fourteenth Amendment. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S. Ct. 232, 83 L.Ed. 208. Judgment affirmed.

CLARK, Circuit Judge (dissenting).

In a case of this kind, with such serious social implications, it seems to me peculiarly desirable that judges shall confine themselves to the legislative intent to the utmost extent possible. Here that intent does not seem to me disputable on the words of the statute itself; but if any doubt exists, I think it must be dispelled by a consideration of the legislative history. The statute presents a closely integrated system of selection of fit registrants according to state and local quotas based on the number of available men, with an overriding prohibition against any discrimination in selection for race or color; and the history of this prohibition shows just how overriding it was intended to be.

In stating the legislative history, the opinion stresses the fact that segregation had previously existed in the Army and that the Wagner and Fish amendments to the Selective Training and Service Act were made in the light of that fact. It argues, therefore, that the amendments, following cases dealing with discrimination claimed to be repugnant to the Fourteenth Amendment, require only equal, even if separate, treatment of Negro inductees while in the Army.[1] All that can be accepted without reaching our conclusion; that requires the further step which overlooks the expressed purpose of the proponents and nullifies the provision that in the *selection* of men for induction there shall be no discrimination against any person on account of race or color.

Thus, Senator Wagner explained his amendment as not an attempt to control the Army after it received the selectees, but a requirement of equal opportunity to serve; and he presented a letter from the Secretary of the National Association for the Advancement of the Colored People asking for the amendment because Negroes had been allowed to enlist only in certain specified regiments. 86 Cong.Rec. 10,789, 10,889. This amendment—which is not the important one here and which was passed only after long debate and determined opposition mainly on the ground that it was unnecessary, 86 Cong. Rec. 10,888-10,895—thus concerned the important matter of *choice* of men for the Army. When the matter came up later in the House, the Fish amendment was supported to make assurance sure and to quiet the doubts of representatives of the colored people. Again there was a sharp debate, not in opposition to the principle expressed, but on the ground that the pro-

---

[9] 86 Cong.Rec. p. 11,676.

[10] 86 Cong.Rec. p. 11,427.

[1] Referring to this case, Professor Robert E. Cushman, in Some Constitutional Problems of Civil Liberty, 23 B.

U.L.Rev. 335, 361, makes this same point of "the general policy of segregation" upheld in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; but he does not discuss the question of discrimination in *selection.*

vision was unnecessary, as already incorporated in that Act. Congressman Fish said he was not the originator of the amendment, but sponsored it by request of a group of prominent colored leaders "who are interested in and represent the interests of 11,000,000 Negroes in America." 86 Cong. Rec. 11,675, 11,676. And so at length after one vote wherein the amendment appeared to be lost, it finally passed the House by a fairly close vote, 86 Cong. Rec. 11,680, and remained in the bill at all times thereafter.

In this debate on the Fish amendment, the Committee on Military Affairs, which had reported the bill, opposed the change. The Army letter to Congressman Thomason of Texas, 86 Cong. Rec. 11,427, seems to me of quite a different tenor than as stated in the opinion;[2] but the intimation it contained that estimates of registrants were being made according to color may be one of the things which led to disquietude upon the part of the colored people and to the proposal of the amendment *two days later*. It is significant, too, that Chairman May of the Committee on Military Affairs, in opposing the amendment as unnecessary, reported that the Committee was adopting two provisions adequate to cover the matter—one the Wagner amendment to the Senate bill, and the other the proviso to § 3(a) quoted in the opinion that no man should be inducted until he was acceptable to the land or naval forces. Then he explained that this proviso was not to be used to permit discrimination by the clear statement: "That latter provision merely means that he must stand the same kind of medical examination and physical test as any other man, regardless of race, color, or condition." 86 Cong. Rec. 11,676. The other similar proviso, also quoted from the same statute, that no man should be inducted until adequate sanitary and other facilities were available had just been adopted that same day after similar considerable debate as to its necessity and expressly to meet the condition asserted to have obtained in the First World War when men were said to have been inducted only to become sick or die because of lack of adequate sanitary and other facilities. 86 Cong. Rec. 11,670.

It seems hardly doubtful that these provisos added to § 3(a) are but the protection thought necessary for the inductees and were not intended, and should not be construed, to nullify the anti-discrimination (Fish) amendment to the next section, § 4(a), which in terms refers to and conditions the earlier section thus, "The selection of men for training and service *under section 3* * * * shall be made in an impartial manner * * *: Provided, That in the selection and training of men under this Act, and in the interpretation and execution of the provisions of this Act, there shall be no discrimination against any person on account of race or color." (Italics added.) And the Wagner amendment to § 3(a) itself refers forward to and depends upon "the limits of the quota determined under section 4(b) * * * for the subdivision in which he resides." Thus, all parts of the statute must be read together and the provision against discrimination in selection for color must be given meaning. In fact, I find it difficult to think of more apt language to express the Congressional intent; the suggestion that Congress should have said something more, or amended the statute, means in effect that it should be watchful to see how a statute is violated and then expressly negative such violation or be assumed to sanction it.

Now it seems to me that the result stated in the opinion simply wipes out this provision so insisted upon as assur-

---

[2] The letter does not mention separate white and Negro quotas and calls; it does, however, attempt an estimate of the number of registrants, and, taking Texas, as an example, considers separately the white and Negro population and the white and Negro persons already serving in the Army. So far as appears, this method of estimating may be required by the nature and form of the available statistics.

It is easy to slip from the discrimination here, which is based solely on Army calls for men, to that stated at the end of the opinion, viz., "separate quotas in the requisitions based on relative racial proportions of the men subject to call." Whether or not that would violate the quota provisions of § 4(b), it is obvious that such a system, substantially following population trends, is more likely to come closer to calling the Negroes in their proper turn than does the one actually employed. The same is true of induction of Negroes "in accordance with the ratio they bear to the population," also referred to in the opinion.

ance to prevent this very result. For it is not seriously contested that white and colored draftees are not called according to their officially determined order numbers (established originally by the much publicized drawing from the gold fish bowl in Washington and later by similar impartial chance), but only according to the calls of the Army officials separately for whites and for Negroes. The dislocation occasioned by a single such separate call, intensified as these calls are repeated throughout the history of the draft, was frankly admitted by Colonel Arthur V. McDermott, the New York City Director of Selective Service, who testified below. He said: "I will repeat—Generally speaking, both Negroes and whites are called according to their order numbers, but if the number of Negroes called is less than the number of whites called, then after the Negro quota has been filled, drawing by order numbers, then the board would proceed according to order numbers, but skipping the Negroes." To the question, "Then you do have a Negro quota and a white quota?" he answered, "Oh, yes." And to the question, "Am I not right in my statement that Negroes and white men are not called in turn or serially, but that the question of color has something to do with the time they are called?" he answered, "That's right." This well-understood practice has led to rather bitter comment recently in Congress, where Congressman McKenzie of Louisiana has pointed out the disruption of a community caused by the taking of pre-Pearl Harbor white fathers, while single available Negroes are left uncalled. 89 Cong. Rec. A-5268, A-5269.[3]

I do not see how such a result can be considered consistent with selection without regard to color. It is suggested, however, that, even if the statute is violated, this registrant cannot take advantage of it, for he has not shown that his call was not delayed, rather than accelerated, by the practice, with the further correlative supposition that delay must of necessity be an advantage. Even if this supposition is to be accepted, there was evidence in the record that Negroes might be called in advance of whites, that in fact a call for Negroes would be allocated "to those boards where Negroes are"; and since this was a matter peculiarly within the Government's knowledge, it would seem under the circumstances to have the burden of going forward with the evidence. But I do not think the supposition can be accepted as being in accord with the habits and thoughts of patriotic citizens during the present crisis or permitted by the statute, which requires that there be no discrimination for color, not that there be no legally disadvantageous discrimination. This registrant asserts his desire to serve and his willingness to do so if inducted according to law. I think it unsound to overlook a violation of law as to him on a premise which we ourselves would reject as patriotic citizens and which is contrary to the whole spirit of the Act, namely, that avoidance of service is to be desired. But notwithstanding the fears expressed by the United States Attorney, this cannot mean the release from the Army of large numbers of soldiers; alike with volunteers, those who have gone into service properly without immediately raising any objections they have, and relying upon them as steadfastly as did this registrant here, surely have no ground to approach the court.

It is to be noted that in final analysis the case for the validity of the call here rests upon the policy of segregation, where equal facilities are afforded, as sanctioned by various Supreme Court decisions. But actually these precedents call for the contrary result. It must not be overlooked that they do insist upon equal accommodations, State ex rel. Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201, which here must mean equal calls to service. However undesirable the colored people may regard service in segregated units, they are justified in asserting that it is less degrading than no service at all or service delayed, if not belittled, in the light of their available man power. I think the judgment should be reversed, with directions that the writ be sustained.

[3] The Congressman quotes from a Louisiana newspaper a statement that from a certain parish in that State there have been called for military service a group of men with pre-Pearl Harbor children, while 267 Negro single men remain on the Class 1-A list, and that both white and Negro citizens are disturbed by the discrimination.