IN RE APPLICATIONS FOR REASSIGNMENT: JOSEPHINE OPHELIA BOYD
FROM DUDLEY HIGH SCHOOL TO SENIOR HIGH SCHOOL; HAR-
OLD MCDUFFIE DAVIS, ELIJAH J. HERRING, JR., AND RUSSELL HERRING
FROM LINCOLN JR. HIGH SCHOOL TO GILLESPIE JR. HIGH
SCHOOL; BRENDA KAY FLORENCE AND JIMMIE B. FLORENCE FROM
BLUFORD SCHOOL TO GILLESPIE ELEMENTARY SCHOOL.

(Filed 10 January, 1958)

1. **Injunctions § 8: Notice § 3—**

Upon the preliminary hearing of petitions for mandatory injunc-
tions, held at the request of petitioners, motion of respondents, who
seek no affirmative relief, to dismiss the petitions may be heard even
though petitioners are not given ten days notice of the motion, G.S.
1-581 having no application.

2. **Schools § 3d—**

Where a municipal board of education grants the applications for
reassignment of certain pupils, appeal from its decision may be taken
as to each child only by the child's parent, guardian, or person stand-
ing *in loco parentis*, and the parents of other children attending the
schools to which the reassignments are made are not the parties
aggrieved by such reassignments within the purview of G.S. 115-179,
and have no standing in court to contest the assignments. More-
over, each reassignment must be challenged separately and cannot be
challenged *en masse*.

3. **Statutes § 5b—**

The interpretation given to proposed legislation by the department
proposing it, as well as the interpretation by the department responsi-
ble for its administration, are aids in the construction of the statute.

4. **Injunctions § 8—**

Where, upon the hearing of petitions for mandatory injunctions,
petitioners allege no invasion of any legal right, injunctive relief is
correctly denied.

PARKER, J., concurs in result.

APPEAL by J. E. Turner, Jr. and others from *Preyer, J.*, at
Chambers, August 1957, GUILFORD.

Greensboro City Board of Education (hereinafter designated
as Board) in May 1957 promulgated rules and regulations for
the enrollment and assignment of pupils as provided by Art. 21,
c. 115 of the General Statutes of North Carolina. The Board
is an administrative unit charged with the responsibility of
operating the public schools within its boundaries. Prior to the
1957-1958 school year the Board operated separate schools for
members of the white and Negro races.

During June 1957 and within the time prescribed by the regu-
lations, applications were made by parents of Negro children for
reassignment from schools they had previously attended to
schools theretofore restricted to white children. The applica-

tions, made for individual children, designated the school the applicant desired his child to attend and gave the reason for the requested reassignment. Separate requests were filed for the reassignment of: (1) Josephine Ophelia Boyd to Senior High School; (2) Harold McDuffie Davis to Gillespie Junior High School; (3) Elijah H. Herring, Jr. to Gillespie Junior High School; (4) Russell Herring to Gillespie Junior High School; (5) Brenda Kay Florence to Gillespie Elementary School; (6) Jimmie B. Florence to Gillespie Elementary School. The Board held a public hearing on each application on 18 June 1957. It did not at that time reach a decision on any of the applications and postponed further consideration of the applications to its regular meeting in July. At its regular meeting on 23 July 1957 the Board again considered each of these applications and directed the enrollment of each of these six children in the school specified in the application filed by his or her parent.

On 2 August 1957 James E. Turner, Jr., James A. Strunks, and James W. Cudworth filed in the Superior Court of Guilford County papers reading as follows:

"IN RE: APPLICATIONS FOR REASSIGNMENT:

Josephine Ophelia Boyd from DUDLEY HIGH SCHOOL TO SENIOR HIGH SCHOOL; Harold McDuffie Davis, Elijah J. Herring, Jr., and Russell Herring from LINCOLN JR. HIGH SCHOOL TO GILLESPIE JR. HIGH SCHOOL; Brenda Kay Florence and Jimmie B. Florence from BLUFORD SCHOOL TO GILLESPIE ELEMENTARY SCHOOL."

"NOTICE OF APPEAL
TO THE GREENSBORO CITY BOARD OF EDUCATION:

You are hereby notified that an appeal has been taken from the order or orders of said Greensboro City Board of Education, reassigning the above named Negro children to the designated white schools. A copy of said appeal is hereto attached."

"APPEAL ENTRY

BEFORE THE GREENSBORO CITY BOARD OF EDUCATION

J. E. TURNER, JR., JAMES A. STRUNKS and JAMES W. CUDWORTH, being citizens and taxpayers of Greensboro and Guilford County, N. C., and being parents of white children assigned to Senior High School and Gillespie Park Elementary and Junior High Schools, and being aggrieved by the order or orders of The Greensboro City Board of Education, on their own behalf and on the behalf of all other parents and taxpayers similarly situated do hereby, acting through their attorney, except to the order or orders of The Greensboro City Board of Education

entered on July 23, 1957, reassigning the above named Negro children to Senior High School and Gillespie Park Elementary and Junior High Schools. Appeal is hereby taken to the Superior Court of Guilford County under provisions of General Statutes of North Carolina, Section 115-179."

Copies of the "Notice of Appeal" and "Appeal Entry" were, on 2 August 1957, served on the Secretary of the Board.

On 22 August 1957, a petition entitled "IN RE: APPLICATION FOR REASSIGNMENT: Josephine Ophelia Boyd from Dudley High School to Senior High School", in which J. E. Turner, Jr., Mrs. A. M. Pickard, H. G. Stubblefield, Mrs. H. G. Stubblefield, Alton R. Braswell, J. H. Cockman, and Mrs. J. H. Cockman are designated petitioners, was filed with the Clerk of the Superior Court of Guilford County. Petitioners allege in brief that they are citizens and taxpayers of Greensboro and Guilford County and are the parents of white children assigned to Senior High School, that heretofore such school has been attended by white pupils only, that the applicant (Josephine Ophelia Boyd) reassigned is a Negro child and has heretofore attended a school operated exclusively for Negroes, that an application had been filed with the school board for the reassignment of the applicant, that the application had been favorably acted on and the child reassigned to the school theretofore operated exclusively for white children, that the order of the board directing such reassignment "will disrupt the orderly and efficient administration of said public school and will greatly impair the proper and effective instruction of the pupils there enrolled and will gravely endanger the health, safety, and welfare of the children there enrolled."

Petitioners aver they are parties aggrieved within the meaning of the statute, c. 366, S.L. 1955, G.S. 115-179. They pray for an order enjoining the Board from enrolling and permitting the applicant to attend the designated school.

Similar petitions seeking the same relief were filed by J. E. Turner, Jr. and others with respect to each of the other five children who had been reassigned by the Board.

Upon the filing of the petitions, Judge Preyer gave notice to petitioners and the Board that a hearing would be held on 29 August 1957.

The Board filed: (1) a motion to dismiss the appeal for that (a) the parties named were not "persons aggrieved," and hence were not permitted to appeal, and (b) appeals could only be taken from orders made on specific applications; (2) answers to each of the petitions seeking to enjoin the Board from enrolling the named children. The answers allege the Board acted in good faith in complying with the assignment statute.

At the time fixed for the hearing, counsel for appellants and for the Board announced that they were ready to proceed. Counsel for appellants requested the court not to consider at that time the motion of the Board to dismiss or the demurrer *ore tenus* then made.

The court proceeded with the hearing, found as a fact that the Board acted in good faith in the performance of the duties imposed on it by law. It concluded that the assignment statute was constitutional, that Turner, Strunks, and Cudworth were not parties aggrieved under the statute, and that appeals could only be taken by an aggrieved party from a ruling on a specific application, and for that reason the attempted appeal was ineffective. He declined to issue an order restraining the Board from assigning the named children and declined to enjoin pending the hearing of this appeal.

Appellants-petitioners excepted and appealed.

*J. J. Shields for petitioner appellants.*
*Robert F. Moseley and Welch Jordan for respondent appellee.*

RODMAN, J. Four errors are assigned: (1) Hearing the motion to dismiss; (2) granting the motion to dismiss the appeal; (3) refusal to issue the restraining order prayed for; and (4) refusal to issue a restraining order pending the hearing of this appeal.

The date for the hearing was fixed at the request of appellants. This date was seven days after the petitions were filed seeking mandatory injunctions. At the time fixed for the hearing appellants announced their readiness to proceed, with knowledge of the motion to dismiss, filed two days prior to the hearing and five days after the filing of the petitions for mandatory injunctions. The motion to dismiss sought no affirmative relief. It was a mere statement of the reasons why the parties seeking orders from the court were not entitled to call on the court to act. G.S. 1-581 has no application to the factual situation here presented. *Collins v. Highway Com.,* 237 N.C. 277, 74 S.E. 2d 709; *Harris v. Board of Education,* 217 N.C. 281, 7 S.E. 2d 538.

Is the motion to dismiss the appeal soundly based? The history of the assignment statute, the reasons given by its sponsors for its enactment, the interpretation given to it by the Advisory Committee on Education appointed pursuant to legislative direction, the language of the statute, and judicial interpretation are all in accord. Each suggests an affirmative answer.

History of the statute: North Carolina, since the beginning of the present century, has consistently pursued a policy of

providing better educational facilities for all of its children. Illustrative: c. 1046, S.L. 1953, authorizing the issuance of $50,000,000 in bonds to provide funds to assist in construction of school buildings; c. 1156, S.L. 1953, appropriating in excess of $120,000,000 per year for public education. These appropriations were materially supplemented by local funds. Our law at that time was mandatory that the different races should be educated in separate schools but without discrimination in favor of either race. Art. IX, s. 2, Constitution of 1875. This policy of separation for educational purposes had been accepted as constitutional since the decision in *Plessy v. Ferguson,* 163 U.S. 537, 41 L.Ed. 256.

The decision in the Segregation Cases *(Brown v. Topeka)* 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R. 2d 1180, announced on 17 May 1954, immediately created problems for North Carolina. How could our declared purpose of providing an education for our children be effectively pursued? To help in finding an answer to this question, Governor Umstead, a staunch advocate of public education, on 10 August 1954, appointed a committee "to study the effects of the decision of the Supreme Court of the United States of May 17, 1954, dealing with racial segregation in the public schools and make recommendations as to how the problems arising therefrom might be met." This committee was composed of seventeen distinguished citizens of North Carolina. Both races were represented. The recognition given to public schools, higher education, industry, agriculture, the legal profession, and communications and public information is apparent from a casual examination of committee membership.

Governor Umstead died in the fall of 1954. The committee made its report to Governor Hodges. The report was unanimous. It was filed 30 December 1954. It was promptly made available to the Legislature which convened in January 1955. The committee, having declared its belief in the desire of the people of the State to provide for the public education of their children in a legal manner, said: "The Committee is of the opinion that the enrollment and assignment of children in the schools is by its very nature a local matter and that complete authority over these matters should be vested in the county and city board of education. With such authority local school boards could adopt such plans, rules and procedures as their local conditions might require. The Committee finds that public school problems differ widely throughout North Carolina and that there is even a wide variation of problems and conditions within counties themselves. As these problems unfold and develop from month to month and from year to year local school administrative units could move

to meet each problem as it arises if such units are given complete authority over the matters referred to above. We, therefore, recommend that the General Assembly of North Carolina enact the necessary legislation to transfer complete authority over enrollment and assignment of children in public schools and on school buses to the county and city boards of education throughout the state."

The committee recommended that the Legislature authorize a continuing study of the problem.

The 1955 Legislature gave its approval to the report by enacting the assignment statute and providing for a committee of seven to continue the study. Acting pursuant to legislative direction, Governor Hodges appointed a committee of seven, known as the North Carolina Advisory Committee on Education.

That Committee made a report 5 April 1956. It recommended that all school units "1. Recognize that there is no law compelling the mixing of the races. 2. Recognize that since the Supreme Court decision there can be no valid law compelling the separation of the races in public schools. 3. Declare that initial assignments to schools will be made in accordance with what the assigning unit (or officer) considers to be for the best interest of the child assigned, including in its consideration, residence, school attended during the preceding year, availability of facilities, and all other local conditions bearing upon the welfare of the child and the prospective effectiveness of his school."

Further touching on the assignment statute, the Committee said: "It may well be that before the people of North Carolina will give the necessary support to an honest trial of the assignment plan they will need to be assured of escape possibilities from intolerable situations—assured that no child will be forced to attend a school with the children of another race in order to get an education and assured, second, that if a public school situation becomes intolerable to a community, the school or schools in that community may be closed. To achieve these objectives there must be some changes in the North Carolina Constitution and some legislative enactments based thereon."

It recommended the calling of a special session of the General Assembly in the summer of 1956. On 23 July 1956 the Advisory Committee on Education filed its second report. The report was addressed to Governor Hodges, Lt. Governor Barnhardt, and Mr. Larry I. Moore, speaker of the House of Representatives. It contained proposed bills to be submitted to a special session of the General Assembly to accomplish the general purpose declared in its report of April 1956.

Among the bills proposed was a bill amending the assignment statute of 1955 which had then been incorporated in the 1955

supplement to our Consolidated Statutes as Art. 21, G.S. 115-176, 115-179. A comparison of the original with the amended statute demonstrates the purpose to make the statute conform to practical application in the operation of the schools. The 1955 act used the words "enroll" and "enrollment." These words were changed to conform to the school practice to "assign" and "assignment." The 1955 act required the enrollment or assignment of each child in an administrative unit to a school within that administrative unit. This was modified to permit assignment to a school outside of the administrative unit, a need in part suggested by *In re Assignment of School Children,* 242 N.C. 500, 87 S.E. 2d 911. Provision was made for the original mass assignment of children without the formality of a hearing and with notice given personally or by publication where children would attend during the coming year but with the right reserved to apply for a reassignment to another school.

The report of the Committee became known as "The Pearsall Plan." The Committee issued a bulletin entitled "The Pearsall Plan to Save our Schools." It lists legislative recommendations made by it and says with respect to the Assignment Act: "This bill would make certain clarifications in the present Assignment Act which was enacted by the 1955 Session of the General Assembly."

The same document contains a series of questions and answers designed to pin point the Committee's recommendations and the reasons underlying its recommendations. We quote pertinent questions and answers: "1. What is the purpose of this Program? A. It is an effort to preserve North Carolina's Public School system . . . 5. If the people approve this program will my child be forced to attend school with a member of another race? A. Emphatically No. 6. Is this whole thing an effort to defy the U. S. Supreme Court? A. It is not defiance. It is an attempt to stay within that decision, even though a great majority of our citizens disapprove the Supreme Court's ruling . . . 8. Did the U. S. Supreme Court say that my child has to go to school with a member of another race? A. No. 9. What did it say, in effect? A. Only that we cannot deny admission of a child to a public school solely on the basis of race. 10. If conditions in my child's public school become intolerable, what happens? A. Your school board can order an election; or 15% of the people in your school unit can ask for an election on suspending it. If the school is closed, it can later be reopened by vote of the people in the same manner. 11. Suppose children of another race are assigned to the school attended by my child and I object? What remedy will I have? A. Your child can be reassigned to another public school provided one is reasonably

available, or, if one is not available, you can withdraw your child from school. Then you may send your child to private school."

The interpretation here given is clear: If a parent is dissatisfied with the operation of the school because of the assignment of another pupil to that school, his remedy is to request reassignment of his child, not to appeal the assignment of the other pupil.

The Circuit Court of Appeals for the Fourth Circuit, in *Carson v. Board of Education of McDowell County*, 227 F. 2d 789, reiterated the conclusion that a child could not, solely because of color be denied the right to attend a public school. It also took note of the assignment statute, c. 366, S.L. 1955, and held that an adequate administrative remedy for each child to assert his rights as declared in the Segregation Cases, *supra*. This decision was noted with approval in the April 1956 report of the Advisory Committee.

The history of the statute, we think, shows that the "person aggrieved" permitted to appeal from a decision of a school board assigning a child is the child assigned or some one acting in behalf of that child.

The interpretation given to proposed legislation by the department proposing it, as well as the interpretation by the department responsible for its administration, is helpful to a court when it is called upon to interpret legislative language. *Cannon v. Maxwell*, 205 N.C. 420, 171 S.E. 624; *Corp. Com. v. R. R.*, 185 N.C. 435, 117 S.E. 563; *Comrs. v. Davis*, 182 N.C. 140, 108 S.E. 506; 50 Am. Jur. 274; Southern Statutory Construction, 3rd Ed., Secs. 5003-4.

To give the statute the interpretation claimed by appellants would be contrary to the declared intent of the committee which recommended its passage and would raise grave question as to its constitutionality. *Gibson v. Board of Public Instruction of Dade County*, 246 F. 2d 913; *School Board of City of Newport News, Va. v. Atkins*, 246 F. 2d 325; *School Board of Charlottesville, Va. v. Allen*, 240 F. 2d 59; *Orleans Parish School Board v. Bush*, 242 F. 2d 156.

The language of the statute is clear with respect to the right to apply for a reassignment. That right is limited to the parent, guardian, or person standing *in loco parentis* to the child seeking reassignment. G.S. 115-178. Notice of the Board's decision must be given applicant or his parent. No notice is required to be given to the parents of other children; they are not parties to the hearing; they are not entitled to notice of the Board's decision.

The statute, G.S. 115-179, grants "any person aggrieved by the final order" the right to appeal within ten days of the date of the order. Appellants insist that they are "persons aggrieved" and therefore entitled to appeal. We do not agree.

The words "party aggrieved" with respect to the right to appeal have been in our statute since 1868, G.S. 1-271. The phrase has been defined on a number of occasions and has been applied in a multitude of cases. "An aggrieved party is one who has been injuriously affected by the act complained of, one who has thereby suffered an injury to person or property. 3 C.J.S. 350, 1 C.J. 973. Websters' International Dictionary defines an aggrieved party as one 'adversely affected in respect of legal rights.'" *James v. Denny*, 214 N.C. 470, 199 S.E. 617; "The party aggrieved, in statutes of this character, is the one whose legal right is denied," *Summers v. R. R.*, 138 N.C. 295; "And a 'party aggrieved' is one whose right has been directly and injuriously affected by the action of the court." *Freeman v. Thompson*, 216 N.C. 484, 5 S.E. 2d 434; "A person is . . . aggrieved, in the legal sense, when a legal right is invaded by the act complained of . . ." *American Surety Co. v. Jones*, 51 N.E. 2d 122 (Ill.); ". . . 'aggrieved' refers to a substantial grievance, a denial of some personal or property right or the imposition of a burden or obligation." *In re Appeal of Town of Greenfield*, 73 N.W. 2d 580 (Wisc.); *Gregg v. Williamson*, 246 N.C. 356, 98 S.E. 2d 481; *Queen City Coach Co. v. Carolina Coach Co.*, 237 N.C. 697, 76 S.E. 2d 47; *Canestrino v. Powell*, 231 N.C. 190, 56 S.E. 2d 566; *Gill v. McLean*, 227 N.C. 201, 41 S.E. 2d 514; *In re Estate of Suskin*, 214 N.C. 219, 198 S.E. 661; *Summerlin v. Morrisey*, 168 N.C. 409, 84 S.E. 689; *Faison v. Hardy*, 118 N.C. 142; *Watkins v. Grier*, 224 N.C. 334, 30 S.E. 2d 219; *Recreation Com. v. Barringer*, 242 N.C. 311, 88 S.E. 2d 114.

Applicants who were reassigned were entitled to attend one of the schools provided by the State for the education of its youth. Children of appellants were likewise entitled to attend one of the schools provided by the State. Neither had a right to prescribe the manner in which the other should be educated. To say that the parent of every child has a right to challenge the assignment of another child because the assignment is not in the best interest of his child or to challenge the right for any of the other reasons provided by statute would, for all practical purposes, make the administration of the public school system an utter impossibility. We think the Legislature did not intend to give a broader connotation to the words "person aggrieved" as used in this statute than has heretofore been given to similar words. We conclude that "person aggrieved" as used in this

statute means the person who makes application for the particular child for reassignment.

What is the character of the proceeding authorized by statute for the reassignment of a pupil? We think the question is answered by this quotation from *Joyner v. Board of Education,* 244 N.C. 164, 92 S.E. 2d 795: "The question is settled by the statutes governing the enrollment of pupils in the public schools of North Carolina and, in the opinion of the Court, they do not authorize the institution of class suits upon denial of an application for enrollment in a particular school. . . . Therefore, this Court holds that an appeal to the superior court from the denial of an application made by any parent, guardian or person standing *in loco parentis* to any child or children for the admission of such child or children to a particular school, must be prosecuted in behalf of the child or children by the interested parent, guardian or person standing *in loco parentis* to such child or children respectively and not collectively." That case clearly and definitely interprets the statute to the effect that consideration of applications for reassignment must be made individually and not *en masse* and appeals heard *de novo.* If the appeal is to be heard *de novo* as the statute provides, every reason given for individual hearings in the first instance applies with equal force to the hearing on appeal. Appeals are not intended to settle generalities. They deal with rights of individual students.

It will be noted that the students whose assignments are here challenged by appellants have been assigned to different schools. Some are in elementary school; some, in high school; some, in junior high school. Patently the same questions are not involved in each instance. Even if appellants were parties aggrieved, it is manifest that the appeal here attempted does violence to the principles enunciated in the *Joyner* case. We adhere to the interpretation then given to the statute.

In effect that was the interpretation placed on the statute in *Carson v. Board of Education of McDowell County, supra,* referred to approvingly by the Advisory Committee on Education.

For each of the reasons given we conclude that Judge Preyer was correct in dismissing appellants' attempted appeal from the Board.

Since there was nothing pending before the court and the petitioners alleged no invasion of any rights of theirs, it follows that the court was correct in denying injunctive relief sought. The judgment is

Affirmed.

Parker, J., concurs in result.